**GEORGE K. BAUM PROPERTIES, INC., Allen J. Block, James H. Block, Kenneth G. Block, Stanley J. Bushman and Charles M. Helzberg, as all the general partners of Summit House Associates, Respondents,**

v.

**COLUMBIAN NATIONAL TITLE INSURANCE CO., Appellant.**

**No. WD 40400.**

Missouri Court of Appeals, Western District.

Nov. 15, 1988.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 27, 1988.

Application to Transfer Denied Feb. 14,1989.

Robert C. Jones and Robert E. Jones of Vines, Jones, Ross, Kraner & Rubin, St. Louis, for appellant.

Paul E. Vardeman and Matthew R. Hale of Polsinelli, White, Vardeman & Shalton, Kansas City, for respondents.

Before FENNER, P.J., and MANFORD and GAITAN, JJ.

MANFORD, Judge.

Plaintiffs brought an action for breach of a title insurance policy issued by Columbian National Title Insurance Company, and for a vexatious refusal to pay. The jury returned a verdict against the title insurance company in the amount of $1,210,000, and judgment was entered. The title insurance company appeals.

The parcel of real estate involved in this case (subject property) is located at the intersection of Summit Street and 47th Street in Kansas City, Missouri. After a series of transactions and conveyances, on December 28, 1983 the respondents (plaintiffs at the trial level) acquired a long-term leasehold interest in the subject property and purchased the building thereon known as Summit House. The respondents paid

$7,050,000 in the transaction.[1] Columbian National Title Insurance Company (Columbian National), appellant, issued a Leasehold Owner's Policy of title insurance to respondents in the face amount of the $7,050,000 purchase price. When respondents received the policy, it did not contain notification of a deed restriction running in favor of the J.C. Nichols Company.

At the time of the purchase by respondents, the subject property was zoned R–5. This classification allowed office buildings of approximately twelve stories, condominiums or apartments, as well as other lower-density residential uses. Respondents applied for a rezoning of the property.

Respondents considered several possible uses for the subject property, eventually conceiving a proposal for development of the entire block surrounding the subject property as "The Plaza Steppes", a mixed-use development of an office building, hotel, health club and high rise apartment complex. Respondents did not own the entire block, but intended to acquire the property in the future.

On December 18, 1984, respondents made a presentation to the J.C. Nichols Company, one of a series presented to neighborhood groups. At the conclusion of the presentation, Miller Nichols, Chairman of the Board of J.C. Nichols Company, informed respondents of a restrictive covenant pertaining to the subject property running with the land in favor of the original grantor, J.C. Nichols Company. Mr. Nichols recalled signing the deed. The restrictive covenant is of record and runs for a period of forty years, expiring in 1990. It restricts use of the subject property to "private residential purposes", including apartment buildings. Commercial uses or changes in the exterior of an existing building are forbidden without the written consent of J.C. Nichols Company.

After adjourning the meeting, the respondents telephoned their real estate attorney, Don Dagenais, to ask about the restriction. Dagenais in turn telephoned Craig Harper at the Columbian National office in Kansas City. On December 19, 1984, Harper informed Dagenais that a check of the records showed a deed recorded in 1950 with the restrictive language in it, but the restriction did not appear in the title insurance policy. Harper referred Dagenais to several persons in the headquarters of Columbian National in Topeka.

Dagenais then telephoned John Dozier, executive vice-president and chief operating officer of Columbian National, on or about December 19, 1984. Dozier asked to receive copies of the relevant documents and a written notification of the claim as provided in the policy. Dagenais made a written notice of the claim on December 21, 1984. The letter provided notification pursuant to Section 3(b) of the policy and a statement in writing of the loss or damage as required by Section 4 of the policy, demanded that Columbian National protect the interests of respondent in the property and take such action as may be necessary to have the restrictions removed from the title to the property. The letter also demanded, in the event the restrictions could not be removed, that Columbian National fully reimburse respondents for all losses, costs, expenses and damages incurred. The letter concluded by stating that the amount of loss was not yet determined. The Dagenais letter requested that Dozier of Columbian National respond promptly to further discuss the matter.

Dozier testified that by the time he received the Dagenais letter dated December 21, 1984, he had talked with Harper and determined that the exception (the restrictive covenant) had, in fact, been missed in the Columbian National title insurance policy issued to respondents.

Dagenais telephoned Dozier on December 28, 1984. Dozier indicated that he did not think there was any loss to be suffered and felt the company was not liable because respondents previously knew of the restriction through the knowledge of Louis Trigg. Dozier believed Trigg to be a mem-

---

1. The partners of respondent partnership purchased a fee interest in the subject property in October, 1985 by exercising an option to purchase, and later transferred the fee interest to the partnership.

ber of the respondent partnership. Dagenais countered that Trigg was not a member of the partnership. Dozier wanted to further investigate the matter. Dagenais asked him to pursue the claim and was anxious to resolve the matter before the upcoming rezoning hearings. Dozier testified that he never denied coverage or liability in this conversation. Dozier testified that he said Columbian National recognized the claim, would see what course of action it could take, and would protect respondents' interests in the subject property. Dozier also testified that the company knew after the Dagenais call that it had until somewhere around the end of January to complete research and determine how to proceed. Dozier testified that one option was to challenge the restriction in court. He felt it was necessary to obtain the zoning decision before litigating anything, and that there was no way to determine damage until the zoning was resolved.

On January 24 or 25, 1985, Dagenais again telephoned the Columbian National office on behalf of respondents. Because Dozier was not there, Dagenais spoke with Larry Hapgood, telling him that respondents had received a demand from the J.C. Nichols Company for a payment to lift the deed restriction, asserting the value of the restriction between 2.1 and 2.8 million dollars. Hapgood promised to relay the information to Dozier.

On January 29, 1985 Dagenais spoke with Dozier on the telephone. It was the testimony of Dagenais that Dozier did not think Columbian National was liable and that the company would deny any responsibility under the policy for several reasons: one, Trigg was a member of the respondent partnership and had previous knowledge of the restriction so as to be excluded from coverage; two, the restriction was due to expire in 1990 and the respondents would not be severely damaged in the interim five-year period; and three, he thought the proposed hotel use would be permitted under the restriction. Dagenais suggested that since his clients had received a demand from J.C. Nichols Company, Columbian National should contact J.C. Nichols Company to attempt to resolve the problem rather than having Dagenais act as an intermediary between J.C. Nichols Company and the title insurance company. Dozier rejected the suggestion.

On January 31, 1985, Dagenais wrote Dozier, enclosing copies of notices for City Plan Commission hearings to take place on February 5 concerning the development plans for the subject property covered by the policy. Dozier's secretary was notified when the February 5th hearings were postponed to March 5, 1985.

On March 4, 1985, Dagenais again telephoned Dozier asking that Columbian National get involved in resolving the matter because respondents had received another demand from J.C. Nichols Company that payment be made for the removal of the restriction. The rezoning hearing was set for the following day. Dagenais testified that Dozier said Columbian National was not liable under the policy. Dagenais stated the company was leaving no alternative to respondents but to deal with J.C. Nichols Company and that respondents were inclined to make an agreement to try to resolve the matter. Dozier did not want to converse over a speaker phone with members of the insured partnership. Dozier testified that he was asked to travel from Topeka to Kansas City that day to meet with the respondents and J.C. Nichols Company representatives to negotiate a settlement. Dozier indicated that Columbian National could not meet with the J.C. Nichols Company to negotiate any kind of a settlement when it could not be determined at that point if there were any damages. Columbian National, Dozier testified, felt it was imperative to know whether the zoning was approved and what uses might be allowed before it could be determined if there was any damage at all. Dozier also testified that when he was informed of the intent to negotiate, he firmly told Dagenais that under no circumstances was he authorized to negotiate that settlement and warned that it could negate coverage of the policy.

Dozier testified that his plan was that Columbian National would indemnify respondents to proceed with their project if

the zoning was approved. If the zoning was not approved, the title insurance company was satisfied that the use which respondents had at that time would be permitted within the provisions of the restrictive covenant. In other words, the covenant would not stop the intended uses under the current zoning.

Later that day, March 4, 1985, respondents reached an agreement with J.C. Nichols Company to pay J.C. Nichols Company $1,000,000 to remove the restrictive covenant from the subject property. Respondents did not obtain a written consent to settle from Columbian National.

Respondents received the approval of the City Plan Commission for the rezoning of the subject property to C–3a2–p. The rezoning would permit "high-density and height office buildings", retail stores and mixed-use development. The preparation for rezoning approval and planning of the project took approximately one year.

On March 7, 1985, Dagenais telephoned Dozier. They discussed the zoning approval and then Dagenais informed Dozier of the agreement with J.C. Nichols Company. Dozier responded that most likely the agreement negated any coverage under the policy. Dagenais testified that he was also told that Columbian National had never really received a proper demand from respondents.

Dagenais telephoned Mr. McCaffree, president of Columbian National, who was familiar with the matter. Dagenais testified that as far as McCaffree was concerned, the company had no liability under the policy. McCaffree felt the restrictions were invalid because they were poorly written and that the company never received a proper demand. This was the last conversation Dagenais had with anyone connected with Columbian National.

On May 29, 1985, Paul Vardeman, representing the respondents, wrote Columbian National a letter stating that the company failed to respond to the December 21, 1984 notice of loss and, consequently, it was necessary for respondents to agree to pay the J.C. Nichols Company $1,000,000 and incur attorneys' fees in resolving the claim.

The letter continued, "Formal notice is hereby made upon you pursuant to the referenced policy to reimburse our client (respondents) for all losses incurred by it as a result of your company's failure to advise of the existence of the restriction. If you desire to reach an amicable settlement of this dispute without the necessity of court action, please advise at once." The record does not contain evidence of a response to this letter.

On August 9, 1985, the agreement between respondents and the J.C. Nichols Company to remove the restrictive covenant from the subject property in exchange for $1,000,000 was signed. The payment was contingent on the final rezoning sought by respondents. The partnership executed a check payable to the J.C. Nichols Company for $50,000 dated February 1, 1986 and a promissory note payable to the J.C. Nichols Company for the balance of $950,000.

On November 27, 1985, the City of Kansas City adopted ordinances approving the development plan of the Plaza Steppes and granting C–3a2 zoning to the subject property. The contingencies in the agreement between respondent and the J.C. Nichols Company were thereby met. The restriction on the subject property was effectively released.

Dozier testified that Columbian National had never reached the point of challenging the restrictive covenants in court, and that Columbian National had not denied the claim or paid anything on it because damages could not yet be ascertained. Dozier also stated that Columbian National believed the restrictions to be very ambiguous as to what limits were placed on uses of the subject property, such that the restrictions could be challenged in court. Dozier testified that on March 4, 1985, he told Dagenais that the company would be willing to protect respondents' interests and would be willing to litigate the issue of the restriction, but could not resolve it until the zoning issue was resolved. Dozier testified that Columbian National knew that once the zoning hearing (in March) was completed, and if the zoning was granted, the

company would have to act immediately and was prepared to do so. If the rezoning was approved at the hearing and the restrictions were still on the subject property, Dozier testified that Columbian National would have indemnified respondents. Dozier recognized that after the zoning hearing, the City Council would have to take further action. Dozier took the position that the agreement between respondents and J.C. Nichols Company most likely negated coverage under the policy because it did not give Columbian National an opportunity to cure the defect under the terms of the policy. He felt that respondents had not been damaged. He did not know whether the policy in question obligated the insurance company to take a position within 30 days after notice of claim.

On December 23, 1985, respondents filed suit against Columbian National. The case was tried to a jury on the counts of breach of contract and vexatious refusal to pay pursuant to §§ 375.296 and 375.420, RSMo 1986. The jury returned a verdict against Columbian National and awarded $1,000,-000 on the policy, $176,000 for interest, $34,000 for attorneys' fees and nothing for a penalty. Judgment was entered accordingly. This appeal by Columbian National followed.

■ Appellant's first point contends that the trial court erred in giving Instruction No. 6 to the jury. Instruction No. 6 was a verdict director regarding liability under the title insurance policy and read as follows:

Your verdict must be for the Plaintiffs if you believe:

First, prior to this suit, Defendant did not pay Plaintiffs on their claim for the loss insured against resulting from the existence of the recorded restrictive covenant in the deed mentioned in the evidence, and

Second, because of such failure, Defendant's contract obligations were not performed, and

Third, Plaintiffs were thereby damaged.

Columbian National argues that the giving of Instruction No. 6 constituted prejudicial error for two reasons. First, the instruction insufficiently described defendant's obligation under the title insurance policy in that it allowed the jury to find that if the defendant insurance company merely failed to pay respondents on their claim, then the defendant's contractual obligations were not performed. Columbian National argues that the instruction misapplies the rationale for the decision and holding in *Davis v. Stewart Title Guaranty Co.*, 726 S.W.2d 839 (Mo.App.1987). Second, the instruction should have included a fourth element, which required the jury to find that the title insurance company did not respond to the insured's claim.

The contractual obligations of Columbian National are set forth within the provisions of the title insurance policy issued to respondents. By the terms of the policy, when presented with written notice of a claim against the policy by an insured, Columbian National has 30 days[2] before it must pursue one of two alternatives: (1) to institute and without undue delay prosecute any action or proceeding, or do any other necessary act to establish title to the estate or interest as insured[3], or (2) to pay

---

2. Policy provision 4:

In addition to the notices required under paragraph 3(b) of these Conditions and Stipulations, a statement in writing of any loss or damage for which it is claimed the Company is liable under this policy shall be furnished to the Company within 90 days after such loss or damage shall have been determined and *no right of action shall accrue to an insured claimant until 30 days after such statement shall have been furnished.* Failure to furnish such statement of loss or damage shall terminate any liability of the Company under this policy as to such loss or damage. (emphasis added)

3. Policy provision 3.(c):

The Company shall have the right at its own cost to institute and without undue delay prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest as insured, and the Company may take any appropriate action under the terms of this policy, whether or not it shall be liable thereunder, and shall not thereby concede liability or waive any provision of this policy.

or otherwise settle in the name of the insured any claim insured against or to terminate all liability of Columbian National by paying the amount of insurance under the policy.[4] Payment on the policy is due within 30 days after the liability is definitely fixed.[5] These contractual obligations are very similar to those imposed by the title insurance policy in *Davis v. Stewart Title Guaranty Co.,* 726 S.W.2d 839 (Mo. App.1987). In *Davis,* this court noted that a nonoption is to not act at all. *Id.* at 850.

Respondents argue that the giving on Instruction No. 6 was not error because this court expressly approved such a breach of contract instruction patterned after M.A.I. 26.02 for an alleged breach of a title insurance policy in the *Davis* case. *Id.* at 857. It must be clarified that in *Davis,* the holding that the instruction properly formulated the cause of action that the title insurance company breached the policy by failure to timely pay Davis on his claim was dependent on the determination that many months earlier the title insurance company had relinquished the policy option to act to invalidate the recorded easement and to establish the title to the estate as insured. *Id.* at 853. It was undisputed that the title company advised Davis that it elected not to bring a quiet title action to challenge the validity of the easement, *Id.* at 843, therefore, there was no factual determination for the jury on this issue. Such a relinquishment of the first alternative under the policy fixed the liability of the insured and left as the only option a payment of Davis' claim within 30 days. As explained in *Davis,*

> The *liability of the insurer was definitely fixed* under the terms of the policy by the relinquishment by the insurer of the option under the policy to act by suit to quiet title to a recorded easement adverse to the estate as insured, ... The

payment of loss was due, under the policy, "within 30 days thereafter." (emphasis added)

*Id.* at 851.

Consequently, the instruction in *Davis* did not refer to the alternative of instituting and prosecuting an action because the insurance company clearly indicated that it chose to forego and relinquish that option. The only remaining alternative was to pay the loss or damage from the defect in marketability from the recorded easement. *Id.* at 851. Accordingly, the jury was instructed on a failure to meet the only remaining obligation under the contract, namely, payment of the loss or damage. The instruction approved in *Davis* remains appropriate for breach of contract actions regarding similar title insurance policies if the only obligation which can be imposed upon the defendant insurance company is one to pay the insured on a claim for an insured loss. However, the instruction approved in *Davis* would be inappropriate for a breach of contract action when the particular facts and circumstances of the case indicate that alternative or additional obligations other than one to pay the loss or damage are imposed on the insurance company and have not been relinquished. In such a case, an instruction that a mere failure to pay a claim results in a breach of contract would incorrectly instruct the jury as to the nature of the insurance company's obligations under the policy. A proper instruction would include reference to the alternative or additional obligations imposed by the policy.

■ What remains to be determined in the case under submission is whether the trial court erred by giving the instruction approved in *Davis* which only refers to a failure to pay on the claim as constituting a

---

4. Policy Provision 5:

The Company shall have the option to pay or otherwise settle for or in the name of an insured claimant any claim insured against or to terminate all liability and obligations of the Company hereunder by paying or tendering payment of the amount of insurance under this policy together with any costs, attorneys' fees and expenses incurred up to the time of such payment or tender of payment, by the insured claimant and authorized by the Company.

5. Policy provision 6.(c):

When liability has been definitely fixed in accordance with the conditions of this policy, the loss or damage shall be payable within 30 days thereafter.

breach of the title insurance company's contractual obligations. The testimony was in conflict regarding relinquishment of Columbian National's right to institute and prosecute any action or proceeding, or to do any other act which it deemed necessary to establish the title or interest as insured. Dagenais, the key witness for respondents, stated that on January 29, 1985 he was given three reasons why the company was not liable and would deny liability on the policy. Dagenais' request that the company act as an intermediary to settle the matter was denied. The day before the March 5 rezoning hearing, Dagenais said he was told again that the company was denying liability under the policy. On March 7, Dagenais revealed that the agreement with J.C. Nichols Company was formed and heard from Dozier that coverage was most likely negated by a settlement without the company's consent. McCaffree allegedly also told Dagenais that the company had no liability. All such denials of liability by Columbian National were oral and the record contains no evidence of a writing to that extent. Communications between the parties apparently ceased after the Vardeman letter to Columbian National on May 29, 1985 seeking reimbursements for respondents.

On the other hand, the testimony of Dozier, a key witness for Columbian National, tends to establish that Columbian National did not intend to relinquish its right to institute an action or do any other act which, in its opinion, would be necessary to establish the title or interest as insured. Dozier testified that he never denied coverage or liability during the December 28, 1984 conversation with Dagenais. Dozier stated that one option was to challenge the validity of the restrictive covenant in court. He felt that it was necessary to obtain the zoning decision before litigating anything, and that there was no way for Columbian National to determine the extent of damage until the zoning issue was determined. Dozier emphasized that even Dagenais' letter of December 2, 1984 said damages were not yet determinable. During the January 28, 1985 telephone conversation with Dagenais, Dozier affirmed that Columbian National recognized the claim and would protect respondents' interests in the subject property. Dozier said Columbian National was still in the process of deciding what course of action to pursue. Dozier's plan was to indemnify respondents to proceed with the Plaza Steppes project if the zoning was approved. He forewarned respondents that a settlement with J.C. Nichols Company without the consent of Columbian National would negate coverage. Dozier was upset and astonished when he learned of the agreement between respondents and J.C. Nichols Company. He felt the agreement would most likely negate the coverage of the policy. Dozier stated that Columbian National felt it could challenge the validity of the restrictive covenants in court, but was never able to get to that stage because respondents settled the claim without consent. Dozier said that Columbian National had not yet paid the claim because damages could not be ascertained.

From the conflicting evidence, it is not clear if Columbian National relinquished the option under the title insurance policy to institute and, without undue delay, prosecute any action or proceeding, or to do any other act which in its opinion may be necessary or desirable to establish the title or interest as insured. Whether there was a relinquishment of the option and/or whether Columbian National breached its obligations under the policy by failing to act in a timely manner are questions of fact for the jury to determine. Hence, Columbian National is correct in arguing on appeal that the trial court erred in giving the instruction of the type approved in *Davis, supra,* to the jury in this case. The policy imposed alternative obligations on the insurance company other than to pay the loss or damage. The instruction that a mere failure to pay the claim leads to nonperformance of contractual obligations is inappropriate in this case because it removes the issue of a relinquishment of rights by Columbian National from the jury's consideration and incorrectly instructs the jury on the nature and extent of the contractual obligations under the policy. A proper in-

struction in this case would include reference to the title insurance company's right, under policy provision 3.(c), to institute and without undue delay prosecute any action or proceeding or to do any other act it deems necessary or desirable to establish title to the estate or interest as insured. The case is reversed and remanded on this ground.

Columbian National is incorrect in arguing that the giving of Instruction No. 6 was prejudicial error for the reason that the instruction should have included a fourth element, which required the jury to find that the title insurance company did not respond to the respondents' claim. A verdict director instruction patterned after M.A.I. 26.02 for breach of contract will be proper if it accurately describes the nature of the breach. In this case, the title insurance policy does not contain a provision specifying that Columbian National had an obligation to respond to the insured's claim. Therefore, the instruction in this case need not require the jury to make such a finding.

Columbian National's second point on appeal contends that the trial court prejudicially erred in giving Instruction No. 9 offered by respondents and refusing to give Instruction No. C offered by Columbian National. Instruction No. 9 was a withdrawal of issue instruction patterned after M.A.I. 34.02, and read as follows:

> The issue of a voluntary settlement by Plaintiffs without prior written consent of Defendant is withdrawn from the case and you are not to consider such evidence in arriving at your verdict.

The trial court refused to give Instruction No. C instructing on the affirmative defense that respondents reached a voluntary settlement without the prior written consent of Columbian National, in violation of the terms of the title insurance policy.[6]

Columbian National pleaded affirmatively the defense of voluntary settlement as eliminating any liability under the policy.

The jury heard testimony of the defense briefly from Dagenais and to a greater extent from Dozier. Both these witnesses also testified to the telephone conversation during which Dozier forewarned Dagenais of negating coverage by a settlement with J.C. Nichols Company and the later telephone conversation during which Dozier learned of the settlement and responded that at that time coverage was most likely negated. The defense of voluntary settlement was tried to the jury throughout the case without objection. The entire policy was received into evidence. An instruction on the affirmative defense would have been within the scope of the pleadings and evidence.

With respect to the approval of Instruction No. 9, the trial court stated:

> And as to the withdrawal, I think I should state rather cryptically that the reason that I gave that requested instruction is, is that it seems to me that if the jury finds under the verdict direction instruction that the defendant breached its obligations under the contract, and find (sic) for the plaintiff on that issue, then, as I understand the law, it states that once the defendant has breached his obligations, it's no longer incumbent upon the plaintiff to perform and be bound by the obligations of the contract, and therefore they can do anything that they think is appropriate reasonably to try to save their situation. And so, when we submit the verdict director for the plaintiff, that really resolves that issue. If they find against the plaintiff, and find that the defendant did not breach the contract, then that ends the case anyway. So that was my reasoning for that.

Columbian National argues that the trial court erred in giving Instruction No. 9 because the court assumed that a breach by Columbian National occurred prior to the March 4, 1985 voluntary settlement by respondents, thus, eliminating the affirmative defense that respondents were the first to breach the policy.

---

6. Policy provision 7:
   No claim shall arise or be maintainable under this policy (a) …, (b) …, or (c) for liability voluntarily assumed by an insured in settling any claim or suit without prior written consent of the Company.

The giving or refusing of a withdrawal instruction is discretionary and error will be found only when discretion is abused. *Helming v. Adams*, 509 S.W.2d 159 (Mo. App.1974). Withdrawal instructions are often given as cautionary devices intended to guard against the jury's consideration of a false issue. It has been stated, "[i]t is not only the office of instructions to inform the jury as to the law of the issues raised, but, where the evidence is of a character as might easily lead to the raising of a false issue, the court ought to guard against such an issue by appropriate instructions." *Roberts v. Emerson Electric Manufacturing Co.*, 362 S.W.2d 579 (Mo.1962).

In this case, the trial court's giving of the withdrawal instruction hinged on the giving of the verdict director Instruction No. 6. It must be noted that the giving of Instruction No. 6 was found, under point one above, to have been error because the instruction did not correctly set forth the obligations of Columbian National under the policy. The verdict director did not and could not resolve the issue of each party's obligations of performance under the terms of the policy. The trial court's stated reasons in this respect were not correct. The trial court viewed the law as: once the defendant breached his obligations, it is no longer incumbent upon the plaintiff to perform and be bound by the obligations of the contract. The trial court incorrectly assumed that if Columbian National did not pay the claim before the March 4, 1985 settlement, then plaintiff was freed from the contractual obligations. Timing became a crucial issue in this dispute because of the various time constraints imposed by the policy and the passage of only approximately 10 weeks or so between the December 21, 1984 written claim and the March 4, 1985 voluntary settlement. Whether the respondents negated coverage by settling before Columbian National breached the contract, if it did at all, was certainly not a false issue in this case, especially when teamed with a proper verdict director stating the obligations of the insurance company. There was evidence to support the giving of an affirmative defense instruction. The trial court abused its discretion,

based on the reasons stated in the record, in using the withdrawal instruction to totally disregard the insurance company's affirmative defense. The judgment is also reversed on this ground.

Columbian National further argues that the trial court improperly relied on estoppel or waiver in ruling that it could not submit the affirmative defense to the jury. However, neither the trial court's statement of reasons nor other portions of the record support this argument. There is no indication of reliance on waiver or estoppel theories in the giving of Instruction No. 9.

The wording of rejected Instruction No. C has not been considered in this court's determination to reverse the judgment, but the parties are cautioned that on remand any submitted jury instruction should be in conformity with M.A.I.

■ Columbian National's third point contends that the trial court erred in entering judgment upon the jury's verdict to the extent that it included prejudgment interest in the amount of $176,000. Columbian National cites *Fohn v. Title Insurance Corp. of St. Louis*, 529 S.W.2d 1, 5 (Mo. banc 1975) in support of its claim that interest is not recoverable on an unliquidated demand. However, in *Catron v. Columbia Mut. Ins. Co.*, 723 S.W.2d 5, 6 (Mo. banc 1987), the Missouri Supreme Court reexamined *Fohn*, noting that *Fohn* restated the general rule, but did not eliminate the interpretations and exceptions. The *Fohn* case did not fit within the exception which allows interest when the amount of damages may be ascertained by reference to any recognized standard. *Id.* at 7. Under the reasoning of *Catron v. Columbia Mut. Ins. Co.*, the trial court did not err in entering a judgment which included an award of prejudgment interest.

■ Finally, Columbian National's fourth point on appeal contends that the trial court erred in excluding portions of the expert testimony of Malcom Drummond, offered by Columbian National. This point is found to be without merit.

The trial court has considerable discretion in the exclusion of evidence and unless

**204**

there is an abuse of discretion, its action will not be grounds for reversal. *Karashin v. Haggard Hauling & Rigging, Inc.,* 653 S.W.2d 203 (Mo. banc 1983). Likewise, a decision as to the relevancy of evidence is left to the sound discretion of the trial court, and the ruling will be upheld on appeal unless an abuse of discretion is shown. *Keller v. International Harvester Corp.,* 648 S.W.2d 584 (Mo.App.1983); *Weatherly v. Miskle,* 655 S.W.2d 842 (Mo. App.1983).

Columbian National argues that Drummond's testimony would have underscored respondents' inability to prove damage by the restrictive covenant. This court reviews the exclusion of the evidence for an abuse of discretion by the trial court. In this case, respondents' damages are measured by the lesser of (a) the cost of removal of the restrictive covenant and (b) the difference between the fair market value of the subject property unencumbered by the restrictive covenant and the fair market value of the property as encumbered by the restrictive covenant, which difference being the direct result of the deed restriction. *Evinger v. McDaniel Title Co.,* 726 S.W.2d 468 (Mo.App.1987). This measure of damages is posed in economic terms.

Drummond was educated and employed as a manager of city planning. He testified during voir dire that he was not a real estate appraiser and had no idea as a professional about property values. He had no opinion about the value of the subject property in this case, either with or without the restrictive covenant. Drummond stated that city planners refer to the "most appropriate use" for a property using an aesthetic or ethereal standpoint rather than the "highest and best use" referred to by real estate appraisers using an economic standpoint. Counsel for Columbian National confirmed that Drummond would not give economic testimony. The trial court sustained respondents' objection to Drummond's testimony, thereby excluding Drummond's opinion as to the most appropriate use of the subject property, because the testimony did not go towards proving the damages.

Columbian National has failed to show that the trial court abused its discretion in excluding Drummond's testimony of his expert opinion of the noneconomic, most appropriate use of the subject property where the damages are measured in economic terms.

It follows that the judgment is reversed, due to the error in the jury instructions, and the cause remanded for a new trial.

All concur.