OSCN Found Document:OPY I, L.L.C. v. FIRST AMERICAN TITLE INSURANCE CO., INC.

 
 
 

 
 
 
 
 
 
 
 

 


 
 
 
 
 
 


 
 OSCN navigation


 
 
 Home

 
 Courts

 
 
 Court Dockets
 

 
 Legal Research

 
 Calendar

 
 Help
 
 





 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 
 
 

 
 
 
 OPY I, L.L.C. v. FIRST AMERICAN TITLE INSURANCE CO., INC.
2015 OK CIV APP 49
350 P.3d 163
Case Number: 112098
Decided: 12/19/2014
Mandate Issued: 05/20/2015
DIVISION III
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION III
Cite as: 2015 OK CIV APP 49, 350 P.3d 163

 

OPY I, L.L.C., Plaintiff/Appellant,
v.
FIRST AMERICAN 
TITLE INSURANCE COMPANY, INC., Defendant/Third-Party 
Plaintiff/Appellee,
v.
ORHAN YAVUZ and 61 MM, LTD., Third-Party 
Defendants.

APPEAL FROM THE DISTRICT COURT OF TULSA COUNTY, OKLAHOMA
HONORABLE DAMAN CANTRELL, JUDGE

AFFIRMED

Kort A. BeSore, Tulsa, Oklahoma, for Plaintiff/Appellant,
Mark W. 
Kuehling, Charles B. Sexson, Oklahoma City, Oklahoma, for 
Defendant/Appellee.


Bay Mitchell, Judge:
¶1 This case arises out of a title insurance coverage dispute between 
Plaintiff/Appellant OPY I, L.L.C. ("Plaintiff") and Defendant/Appellee First 
American Title Insurance Company, Inc. ("Defendant"). Plaintiff, an Oklahoma 
limited liability company, appeals from summary judgment granted in Defendant's 
favor.
¶2 On August 28, 2003 Plaintiff entered into a contract with Third-Party 
Defendant 61 MM, Ltd. ("Seller") for the purchase of a vacant commercial lot 
located in Tulsa, Oklahoma ("subject property"). At the time, Seller was being 
sued by one of its investors, Third-Party Defendant Orhan Yavuz ("Yavuz") in 
federal court.[1] Related to this litigation, Yavuz filed two lis 
pendens notices against the subject property in Tulsa County. Defendant 
issued a title insurance commitment which described the Yavuz litigation and 
required the expungement of the lis pendens notices as a condition 
precedent to issuing title insurance on the subject property. Prior to the 
closing, the lis pendens notices were expunged.
¶3 On December 5, 2003, Defendant closed on a contract to purchase the 
subject property. Plaintiff purchased title insurance from Defendant which 
provided Defendant "insures ... against loss or damage ... sustained or incurred 
by the insured by reason of ... [a]ny defect in or lien or encumbrance on the 
title ... [or] [u]nmarketability of the title...." Both Plaintiff and Defendant 
knew of the existence of the Yavuz litigation and the expunged lis 
pendens notices. Neither the Yavuz litigation nor the lis pendens 
notices were ultimately listed as exceptions on the title insurance policy.
¶4 After its purchase of the subject property, Plaintiff sought to secure a 
construction loan to build commercial office space. Plaintiff claimed it had 
signed a contract with a tenant who agreed to a five (5) year lease at $60,000 
per year. However, Plaintiff alleged its chosen lender, Spirit Bank, refused to 
fund a construction loan for Plaintiff causing the tenant to withdraw from its 
rental agreement. Plaintiff claimed this was due to the uncertainty in its title 
generated by the Yavuz litigation and demanded Defendant either intervene in the 
suit to assert Plaintiff's title or file a separate quiet title action. 
Defendant did not intervene in the Yavuz litigation nor did it file a quiet 
title action at that time. The dispute between Plaintiff and Defendant continued 
informally for some time, ultimately resulting in Plaintiff filing this case in 
October 2007 against Defendant for breach of contract and for breach of the 
implied covenant of good faith and fair dealing. Included with its answer to 
Plaintiff's Petition, Defendant filed a third-party petition against Yavuz and 
61 MM, LTD seeking to quiet title to the subject property in Plaintiff's name.[2]
¶5 After the trial court denied its initial motion for summary judgment 
against Defendant, Plaintiff filed a second motion for partial summary judgment 
against Defendant asking the trial court to determine whether, as a matter of 
law, a particular provision of the title insurance policy, specifically 
paragraph 4(b), imposed an affirmative duty on Defendant to confirm Plaintiff's 
title or whether it merely granted Defendant the option to confirm Plaintiff's 
title. Defendant had previously filed its own motion for partial summary 
judgment against Plaintiff which was still pending at that time. Defendant's 
motion argued that Plaintiff did not have a valid claim under the title 
insurance policy. Defendant maintained it did not have a duty to defend 
Plaintiff in the Yavuz litigation because Defendant was not a party and because 
the orders expunging the lis pendens notices eliminated any right, title, 
or interest Yavuz may have claimed in the subject property. Defendant also 
argued the title insurance policy did not require it to take affirmative action 
to confirm Plaintiff's title by intervening in the Yavuz litigation or filing a 
separate quiet title action. The trial court denied Plaintiff's motion but 
granted Defendant's motion finding Defendant did not breach the title insurance 
policy. Specifically, the trial court stated:

 
 The orders expunging and discharging the two lis pendens 
 terminated any right, title, claim, lien or interest of Mr. Yavuz in the 
 property made the subject of this action. [Defendant] was not obligated to 
 take any additional action to quiet the title of the Plaintiff in relation 
 to the claims of Mr. Yavuz.
On appeal, Plaintiff argues the trial court erred in concluding the title 
insurance policy did not impose an affirmative duty on Defendant to confirm 
Plaintiff's title. Additionally, Plaintiff challenges the trial court's finding 
the expungement of the lis pendens notices eliminated any cloud on 
Plaintiff's title considering the continuing nature of the Yavuz litigation 
after the closing.
STANDARD OF REVIEW
¶6 Whether the trial court's entry of summary judgment was proper is a 
question of law we review de novo. See Manley v. Brown, 1999 OK 79, ¶22, 989 P.2d 448, 455. Summary judgment 
is appropriate where the record establishes no genuine issue of material fact 
and the prevailing party is entitled to judgment as a matter of law. Brown v. 
Alliance Real Estate Group, 1999 
OK 7, ¶7, 976 P.2d 1043. 
Here, the parties agree on the relevant material facts, and the only question 
before us is whether paragraph 4(b) imposes a duty on a title insurer to take 
affirmative action to confirm an insured's title.
NATURE OF TITLE INSURANCE
¶7 Title insurance is "ordinarily considered a contract of indemnity." Steven 
Plitt et al., 11 Couch on Insurance §159:8 (3d. 2013). "The importance of 
the contract not being one of guaranty is primarily that the insurer's liability 
to pay monetary compensation under the policy does not arise immediately upon 
the existence of a covered defect being proved." Id. at §159:9. Rather, 
the insurer has "a range of options by which it may fulfill its obligations 
under the policy" including "paying the amount of the insured's loss, paying the 
face amount of the policy ..., successfully defending the insured against an 
adverse claim, instituting affirmative litigation to clear the title" or 
settling with adverse title claimants. Id. The unique nature of title 
insurance makes it somewhat different from other breach of contract disputes.[3]
INSURER'S "RIGHT" TO TAKE AFFIRMATIVE ACTION
¶8 The relevant policy provisions come from a standard American Land Title 
Association ("ALTA") policy. Paragraph 4(a) provides in pertinent part:

 
 Upon written request by the insured and subject to the options contained 
 in Section 6 of these Conditions and Stipulations,[4] the Company, at its own cost and 
 without unreasonable delay, shall provide for the defense of an insured in 
 litigation in which any third party asserts a claim adverse to the title or 
 interest as insured, but only as to those stated causes of action alleging a 
 defect, lien or encumbrance or other matter insured against by this 
 policy.
Paragraph 4(b) states:

 
 The Company shall have the right, at its own cost, to institute and 
 prosecute any action or proceeding or to do any other act which in its 
 opinion may be necessary or desirable to establish the title to the estate 
 or interest, as insured, or to prevent or reduce loss or damage to the 
 insured. The Company may take any appropriate action under the terms of this 
 policy, whether or not it shall be liable thereunder, and shall not thereby 
 concede liability or waive any provision of this policy. If the Company 
 shall exercise its rights under this paragraph, it shall do so 
 diligently.
Plaintiff framed the issue on appeal as being whether paragraph 4(b) imposes 
a duty on Defendant to take affirmative action to confirm Plaintiff's title. 
While many jurisdictions have analyzed the same uniform policy language, 
Oklahoma has not. Thus, this is a question of first impression in this 
jurisdiction.
¶9 "Oklahoma law governing insurance coverage disputes is well-established. 
The foremost principle is that an insurance policy is a contract." Cranfill 
v. Aetna Life Ins. Co., 2002 OK 
26, ¶5, 49 P.3d 703. 
"Parties may contract for risk coverage and will be bound by policy terms. When 
policy provisions are unambiguous and clear, the employed language is accorded 
its ordinary, plain meaning, and the contract is enforced carrying out the 
parties' intentions. The policy is read as a whole, giving the words and terms 
their ordinary meaning, enforcing each part thereof. This Court may not rewrite 
an insurance contract to benefit either party.... We will not impose coverage 
where the policy language clearly does not intend that a particular individual 
or risk should be covered." BP America, Inc. v. State Auto Property and 
Casualty Ins. Co., 2005 OK 
65, ¶6, 148 P.3d 832. 
(Footnotes omitted). "The interpretation of an insurance contract and whether it 
is ambiguous is a matter of law that will be resolved by the court." Redcorn 
v. State Farm Fire & Casualty Co., 2002 OK 34, ¶4, 55 P.3d 1017. (Internal citation 
omitted). "An insurance contract is ambiguous only if it is susceptible to two 
constructions on its face from the standpoint of a reasonably prudent layperson, 
not from that of a lawyer." Haworth v. Jantzen, 2006 OK 35, ¶13, 172 P.3d 193. This Court will not 
indulge in strained interpretations to create such an ambiguity. Id.
¶10 Plaintiff has not argued the policy language is ambiguous in any way, and 
the plain language of paragraph 4(b) clearly states Defendant shall have the 
"right" to take whatever action "in its opinion may be necessary or desirable to 
establish the title." The policy language does not impose a duty on the insurer 
to take affirmative action to confirm the insured's title. Rather, such 
affirmative action is an option the insurer may exercise should it so choose.[5] In addition to 
the plain language of the policy and decisions from other jurisdictions,[6] this conclusion 
is supported by numerous commentaries on the subject. E.g. Joyce D. 
Palomar, 1 Title Insurance Law §11:11 (2013-2014); Steven Plitt et al., 
11 Couch on Insurance §159:9 (3d. 2013). As summarized in a recent decision from 
the U.S. District Court for the District of Colorado analyzing the same policy 
language at issue here:

 
 Paragraph 4(b) does not place an independent duty to act on [the 
 insurer]; rather, the paragraph mentions only [the insurer's] rights under 
 the policy and [the insurer's] option to take whatever action it deems 
 necessary. If the provision cited by [the insured] created as broad a duty 
 as [the insured] argues, Paragraph 4(b) would have been drafted differently 
 to capture the reasonable expectations of the insured, such as providing 
 that [the insurer] "shall institute" a defense of the insured ... or that 
 [the insurer has] "the obligation to institute" action to clear title. 
 Paragraph 4(b) contains no such mandatory language. Morever, the policy must 
 be interpreted as a whole. Were [the insurer] under the same obligation to 
 defend the insured and unilaterally cure title defects, the differences 
 between the language of paragraph 4(a) and paragraph 4(b) would be left 
 unexplained. U.S. Bank N.A. v. Stewart Title Guaranty Co., No. 
 13-CV-00117, 2014 WL 1096961, at *9 (D. Colo. March 20, 
2014).
¶11 In support of its argument, Plaintiff cited three cases, Davis v. 
Stewart Title Guaranty Co., 726 S.W.2d 839 (Mo. App. 1987); Summonte v. 
First American Title Ins. Co., 436 A.2d 110 (N.J. Super. Ct. Ch. Div. 1981); 
and Jarchow v. Transamerica Title Ins. Co., 122 Cal.Rptr. 470 (Cal. Ct. 
App. 1975) (overruled on other grounds by Soto v. Royal Globe Ins. Corp., 
229 Cal.Rptr. 192 (Cal. Ct. App. 1986)). These cases are distinguishable from 
the instant case.[7] First, Jarchow interpreted different policy 
provisions than those at issue here.[8] The provisions at issue in that case provided:

 
 The [Title] Company, at its own cost and without undue delay shall 
 provide (1) for the defense of the insured in all litigation 
 consisting of actions ... commenced against the insured ...; 
 or (2) for such actions as may be appropriate to establish the 
 title ... as insured, which litigation ... is founded upon an alleged 
 defect, lien or encumbrance insured against by this 
 policy...."
Jarchow, 122 Cal.Rptr. 470, 487. (Emphasis added.) The California 
appellate court found those provisions established two obligations of the 
insurer:

 
 (1) to defend the insured's title if a third party claims, in a judicial 
 proceeding, an interest insured against by the policy, and (2) in the event 
 that a third-party claimant chooses not to litigate his claim, to take 
 affirmative action (by filing an action to quiet title or by offering to 
 compromise the third party's claim) ... Id.[9]
We note the Jarchow policy provisions included mandatory "shall" 
language before both obligations as the two courses of action were connected 
with the disjunctive conjunction "or." Id. While the word "shall" is used 
in paragraph 4(b) of the ALTA policy at issue here, the terms "right" and "in 
its option" included in that paragraph modify the action into options the 
Defendant could take if it so chose. In contrast, paragraph 4(a) of the ALTA 
policy indicates Defendant "shall provide" a defense for Plaintiff if a third 
party brings a claim adverse to Plaintiff's title. The directive does not 
include any qualifying or limiting language. "Were [Defendant] under the same 
obligation to defend the insured and unilaterally cure title defects, the 
differences between the language in paragraph 4(a) and paragraph 4(b) would be 
left unexplained." U.S. Bank N.A. v. Stewart Title Guaranty Co., 2014 WL 
1096961, at *9.
¶12 The Summonte court interpreted policy language nearly identical to 
the policy language at issue here. Summonte, 436 A.2d 110, 115. The court 
noted the policy language in paragraph 4(b) seemed to require the insurer "to 
establish title only at its option." Id. However, the court found:

 
 When liberal and obligatory rules of construction are applied, the 
 reading is different ... and require[s] a construction of the policy in 
 favor of the insured and one which ... will give the insured the protection 
 which he reasonably had a right to expect. This requires paragraphs [4(a) 
 and 4(b)] ... to be read together so that the right to establish the title 
 is a mandatory alternative to the obligation to defend. Id. (Internal 
 quotations and citations omitted).
The analysis employed by the Summonte court is contra to Oklahoma 
law.[10] In 
Oklahoma, insurance policies, like all other contracts, are enforced according 
to the express agreement of the parties, absent ambiguity." BP America, 
Inc., 2005 OK 65, ¶6. See 
also Max True Plastering Co. v. U.S. Fidelity and Guaranty Co., 1996 OK 28, 912 P.2d 861.[11] Here, the terms of the 
policy are not ambiguous and clearly establish Defendant has the right, but not 
the duty, to take whatever affirmative action it may deem necessary to establish 
Plaintiff's title.
¶13 Plaintiff also relied heavily on Davis v. Stewart Title Guaranty 
Co., 726 S.W.2d 839 (Mo. Ct. App. 1987) to support its claim Defendant had a 
duty to take affirmative action.[12] The Davis court, citing specific policy 
provisions at issue there, found the insurer had two alternatives "when 
presented with a claim of an adverse interest to an insured property: (1) to 
pursue a quiet title action without unreasonable delay; or (2) to pay 
damages within thirty days after determination." Davis, 726 S.W.2d at 845 
(emphasis original) (footnotes omitted). The court further concluded the claim 
was presented to the insurer when the plaintiff first requested the insurer to 
take affirmative action to clear its title before plaintiff ever pursued 
litigation on its own. Id. at 853. First, we note we do not have all of 
the relevant policy language from Davis necessary to compare it to the 
ALTA policy language at issue here. The Davis policy language appears to 
be substantially similar, see Davis, 726 S.W.2d at 845, n. 2, but without 
all the relevant portions available for comparison, we decline to blindly follow 
the holding in Davis. Second, we recognize the insurer in Davis 
completely denied liability under the policy even after the insured brought its 
own unsuccessful unlawful detainer action against the adverse claimant.[13] Id. 
at 843. The insurer refused to participate in any appeal from the unlawful 
detainer suit, refused to tender the policy limits, and only filed a quiet title 
action after being sued by its insured.[14]
¶14 Unlike the insurer in Davis, Defendant here had not refused to 
take any action while also denying it was liable under the policy at all. 
Rather, Defendant, while recognizing its option to pursue affirmative action, 
chose to wait until the conclusion of the Yavuz litigation. This course of 
action was permitted by the policy, which stated, in the event of litigation, 
Defendant's liability under the policy did not arise until "there ha[d] been a 
final determination by a court of competent jurisdiction, and disposition of all 
appeals therefrom, adverse to the title as insured."[15] This course of action was also 
supported by the fact title insurance is a policy of indemnity, not guaranty, 
which gives the insurer options other than to pay upon the showing of an adverse 
claim insured by the policy. See George K. Baum Properties, Inc. v. Columbian 
Nat'l Title Ins. Co., 763 S.W.2d 194, 200-02 (Mo. Ct. App. 1988) (reversing 
and remanding suit brought for breach of title insurance policy when jury 
instructions indicated the only option insurer had when presented with an 
adverse claim was to tender the policy limits).[16]
¶15 We hold, therefore, under the particular facts and circumstances 
presented by this case, the uniform ALTA policy language, specifically paragraph 
4(b), does not impose a duty on the insurer to take affirmative action to 
confirm the title of an insured. Because we find Defendant did not have a duty 
to take such affirmative action, the effect of the expungement of the lis 
pendens notices is irrelevant. Even if the expungement failed to eliminate 
any cloud on the title created by the Yavuz litigation, the insurer still was 
not under a duty to take affirmative action and would not have been required to 
perform under the policy, if at all, until the conclusion of the Yavuz 
litigation.
¶16 As explained herein, the order granting summary judgment to Defendant is 
AFFIRMED.

BELL, P.J., and GOREE, J., concur.

FOOTNOTES

[1] Yavuz 
originally filed suit against Seller and other defendants in the District Court 
of Tulsa County, but the matter was later removed to the U.S. District Court for 
the Northern District of Oklahoma. Among several causes of action, Yavuz, who is 
a citizen of Turkey, claimed Seller defrauded him of money used to purchase real 
property in Tulsa. Yavuz claimed to have a constructive trust against property 
owned by Seller, including the subject property. The Northern District 
originally dismissed the suit based on forum non conveniens, but the 
Tenth Circuit reversed and remanded the matter back to the Northern District for 
further litigation on the issues surrounding the forum non conveniens 
ruling. The Northern District again dismissed Yavuz's suit based on forum 
non conveniens concluding Switzerland was a more appropriate jurisdiction 
for the litigation. The Tenth Circuit ultimately agreed and also found, despite 
Yavuz's artful pleading, he had no claim on the real property owned by Seller. 
Yavuz's claims sounded in contract and tort and arose out of his business 
relationship with Seller. Additionally, none of the written agreements between 
Yavuz and Seller granted Yavuz any interest in real property owned by 
Seller.

[2] 
Defendant also filed a third-party petition against Seller alleging Seller owed 
Plaintiff a duty to defend the title because the subject property was conveyed 
by Seller to Plaintiff via warranty deed. Seller then filed its own third-party 
petition against Kenneth M. Smith and Riggs, Abney, Neal, Turpen, Orbison & 
Lewis, Inc. claiming tortious interference with contract. Seller alleged Kenneth 
M. Smith drafted a letter on his firm's letterhead (Riggs, Abney, Neal, Turpen, 
Orbison & Lewis, Inc.) which was forwarded to Defendant, putting Defendant 
on notice of the Yavuz litigation with the intention and result of interfering 
with Seller's sales and contracts involving other property it owned in the 
Woodland Valley Office Park. None of the third-party defendants are parties to 
this appeal.

[3] To 
recover under a claim for breach of contract in Oklahoma, a plaintiff must show: 
1) formation of a contract; 2) breach of the contract; and 3) damages as a 
direct result of the breach. E.g. Digital Design Group, Inc. v. Information 
Builders, Inc., 2001 OK 21, 
¶33, 24 P.3d 834.

[4] Section 
6 provides the insurer with options to perform under the policy including 
tendering the policy limits along with any costs of litigation incurred by the 
insured claimant which were authorized by the insurer. Section 6 also provides 
"[i]n the event of litigation, including litigation by the Company or with the 
Company's consent, the Company shall have no liability for loss or damage until 
there has been a final determination by a court of competent jurisdiction, and 
disposition of all appeals therefrom, adverse to the title as 
insured."

[5] As 
Professor Palomar has noted, "[t]he unspoken qualification [with the insurer 
having the option to take affirmative action] is that the insurer must consider 
such affirmative action to be both necessary and wise. The title insurer is 
unwilling to subject itself and its capital to an insured's judgment as to when 
an affirmative act is required." Joyce D. Palomar, 1 Title Insurance Law §11:1 
(2013-2014).

[6] In 
addition to the Northern District of Colorado, other jurisdictions have also 
examined ALTA title insurance policy provisions and concluded the language does 
not impose a duty on the insurer to take affirmative action to confirm the 
insured's title. E.g. Willow Ridge Ltd. Partnership v. Stewart Title 
Guaranty Co., 706 F.Supp. 477 (S.D. Miss. 1988) (holding that "[w]hile a 
suit to clear title was an option available to [the insurer], it was an option 
and nothing more than that."); Securities Service, Inc. v. Transamerica Title 
Ins. Co., 583 P.2d 1217 (Wash. Ct. App. 1978) (finding the plain language of 
the policy prohibited the court from "rewrit[ing] the insurance contract so as 
to impose a broader duty to 'clear title'") (rejected on other grounds by 
Hartman v. Shambaugh, 630 P.2d 758 (N.M. 1981); Childs v. Mississippi 
Valley Title Ins. Co., 359 So.2d 1146 (Ala. 1978) (declining to find an 
affirmative duty to clear title and distinguishing Jarchow v. Transamerica 
Title Ins. Co., 122 Cal.Rptr. 470 (Cal. Ct. App. 1975) based on the 
differences between the Jarchow policy language and uniform ALTA policy 
language).

[7] In 
addition to the discussion below distinguishing these cases, we note that the 
court in each case seemed to focus on the insurer's "complete denial of 
liability or other failure to respond to the insured's claim." 1 Title Ins. Law 
§11:11 (internal citations omitted).

[8] 
Jarchow interpreted language from a California Land Title Association 
("CLTA") form policy.

[9] Even 
after holding the policy language at issue imposed a duty on the insured to take 
affirmative action, the Jarchow court noted:

 
 It is an oversimplification to assert that the duties to defend and to 
 quiet title are precisely equivalent. The duty to defend arises only after a 
 third-party claimant has filed an action against the insured; in such 
 circumstances it is plain that the insured's title is subject to a real 
 cloud. However, the kindred duty to quiet title does not, and should not, 
 arise in every situation in which the insured requests his insurer to act: 
 there must be present in the facts and circumstances of the case some 
 indicia that the encumbrance with which the policy holder is concerned is a 
 genuine cloud upon his title. (Note, however, that should the insurer decide 
 that the alleged cloud is illusory, it must bear the risk of its decision, 
 and may, subsequently, be found to have acted in bad faith. Jarchow, 
 122 Cal.Rptr. at 488, n. 18.
It is also worth noting that the insured in Jarchow had no other 
remedy available other than to sue the insurer demanding it take affirmative 
action. "The claimant of the easement [adverse title interest] in Jarchow 
would never have initiated legal action which could have evoked the insurer's 
duty to defend because the plaintiff had persuaded local planning commissioners 
to restrict the insured's development of the land in a way that assured he could 
continue to use the portion of land allegedly encumbered by the easement." 1 
Title Ins. Law §11:11.

[10] 
Summonte also presented unique factual circumstances which limited the 
insured's options under the contract. See note 7, supra. In that 
case, the insured requested the insurer remove a judgment lien, which the 
insurer negligently failed to discover and disclose, pursuant to the title 
insurance policy. Summonte, 436 A.2d 110, 111. Not only did the insurer 
refuse to take action to remove the lien, but, contrary to the interests of its 
insured, acquired the lien by a recorded assignment. Id. at 110. The 
insured was left without recourse under the contract because the insurer was 
both lien holder and insurer. The insured could not voluntarily pay the judgment 
as settlement was prohibited without the insurer's consent, and the insured 
could not demand the insurer defend title as there was no litigation to defend 
at that point. Id. at 116. The Summonte court noted that, because 
the insurer owned the lien, principles of equity mandated it remove the lien 
rather than requiring the insured to pay the amount due to the insurer only to 
have the insurer reimburse the insured. Id. at 116.

[11] In 
Max True, the Oklahoma Supreme Court, in response to a certified question 
from the U.S. District Court for the Northern District of Oklahoma, specifically 
adopted the "reasonable expectations doctrine" in the interpretation of 
insurance contracts, stating, "the reasonable expectations doctrine may be 
applied in the construction of insurance contracts and that the doctrine may 
apply to ambiguous contract language or to exclusions which are masked by 
technical or obscure language or which are hidden in a policy's provisions." 
Max True, 1996 OK 28, ¶24. 
"Under the doctrine, if the insurer or its agent creates a reasonable 
expectation of coverage in the insured which is not supported by policy 
language, the expectation will prevail over the language of the policy." 
Id. at ¶8. There is no indication from the record Defendant or any of its 
agents created an expectation Defendant would pursue affirmative action to 
confirm Plaintiff's title. The plain language of the policy prevails, and 
Defendant has no duty to take such affirmative action.

[12] The 
plaintiff in Davis discovered a neighboring church had a recorded 
easement which gave it rights to use part of plaintiff's lot for parking. 
Davis, 726 S.W.2d at 842. Such easement had not been disclosed on 
plaintiff's title opinion, and the title insurer did not except it from 
coverage. Id. Plaintiff tried to sell the lot to the church for parking 
purposes, but the church declined citing its recorded easement and current 
enjoyment of parking rights. Id.

[13] We 
also note the plaintiff in Davis requested permission from the insurer to 
pursue a quiet title action on its own with the insurer paying the attorneys 
fees and costs under its policy of indemnity. Davis, 726 S.W.2d at 843. 
The insurer refused to give its permission. Id. Like the plaintiffs in 
Jarchow and Summonte, supra, the plaintiff in Davis 
was also left without any recourse. The church would never have brought its own 
litigation to assert its easement because it was already enjoying the rights 
guaranteed by such easement. Thus, the insurer's duty to defend the plaintiff in 
litigation would never arise. The insurer also refused to take affirmative 
action to stop the church's enjoyment of the easement and refused to give 
plaintiff its permission to pursue litigation on its own, as required by the 
policy. The Davis plaintiff had no choice but to bring an action against 
the adverse claimant on its own, and then sue its insurer to perform under the 
policy.

[14] In 
addition to a breach of contract claim, the plaintiff in Davis brought a 
claim for "vexatious refusal to pay," which is a statutory claim available under 
Missouri law.

[15] The 
current status of the Yavuz litigation is unclear from the record. However, it 
is clear the Yavuz litigation continued throughout a significant portion of the 
proceedings at the district court level.

[16] The 
insurer in George K. Baum did not totally deny liability as the insurer 
in Davis did. Rather, it opted to wait to pursue affirmative action until 
after the conclusion of a hearing to rezone the subject property. George K. 
Baum, 763 S.W.2d at 201. The title opinion had not disclosed a restrictive 
covenant which the insured wanted removed. Id. However, it was the 
insurer's opinion that, unless the subject property was successfully rezoned, 
the restrictive covenant would not prohibit the insured's planned development. 
Id. at 198-99. Additionally, the insurer felt damages could not be 
determined unless and until the rezoning process was completed. Id. at 
201. The decision of the insurer in George K. Baum is similar to the 
choice of Defendant in the present case to wait until the conclusion of the 
Yavuz litigation before taking any affirmative action or otherwise performing 
under the policy.





 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Supreme Court Cases
 Cite
Name
Level

 2001 OK 21, 24 P.3d 834, 72 OBJ 640, DIGITAL DESIGN GROUP, INC. v. INFORMATION BUILDERS
Discussed
 2002 OK 15, 55 P.3d 1017, 73 OBJ 890, REDCORN v. STATE FARM FIRE & CAS. CO.
Cited
 2002 OK 26, 49 P.3d 703, CRANFILL v. AETNA LIFE INS. CO.
Discussed
 2005 OK 65, 148 P.3d 832, BP AMERICA, INC. v. STATE AUTO PROPERTY & CASUALTY INSURANCE CO.
Discussed at Length
 1996 OK 28, 912 P.2d 861, 67 OBJ 806, Max True Plastering Co. v. U.S. Fidelity and Guar. Co.
Discussed at Length
 2006 OK 35, 172 P.3d 193, HAWORTH v. JANTZEN
Discussed
 1999 OK 7, 976 P.2d 1043, 70 OBJ 530, Brown v. Alliance Real Estate Group
Discussed
 1999 OK 79, 989 P.2d 448, 70 OBJ 2752, Manley v. Brown
Discussed